WEEKS vs. PALMER MOTORSPORTS PARK, LLC, MISC 17-000493

































 
 BONITA J. WEEKS, in her capacity as Building Inspector and Zoning Enforcement Officer of the Town of Palmer, Plaintiff/contempt-complaint plaintiff, v. PALMER MOTORSPORTS PARK, LLC, Defendant/contempt complaint defendant
 MISC 17-000493 
 AUGUST 13, 2021
HAMPDEN, ss.
VHAY, J.
FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER (Rule 65.3(h), Mass. R. Civ. P.)














 This case involves an automobile racetrack in Palmer, Massachusetts, called the Palmer Motorsports Park (the "Park"). It's owned by a limited liability company with a similar name ("PMP"), the defendant in this case. While the Park hasn't achieved the fame of Indianapolis's Brickyard or the Daytona International Speedway, one thing is true about all three tracks: when there's racing, there's noise, and a lot of it. 





 The Park underwent development in the mid-2000s. Before it could be built, it needed a special permit from the Town of Palmer's Planning Board (the "Board"). The original owner of the Park knew when it applied for the permit that noise would be an issue. That owner submitted to the Board as part of the Park's permit application an analysis prepared by an acoustical engineering firm, Resource Systems Group, Inc. ("RSG"), of the Park's anticipated sound (the "2007 RSG Memorandum"). The Board held public hearings on the application between August and December 2007. Noise was the central issue at those hearings. 





 At the conclusion of its hearings, the Board found that the Park's "extensive sound analysis, combined with the remote location of the [site] and its unique 'bowl-shape' topography confirms that the adjoining premises are protected against serious detriment by the provision of sound and sight buffers. . . ." The Board thus concluded that "the surrounding neighborhood will not be negatively impacted in any way by . . . sound . . . ." The Board thus granted the special permit in December 2007 (the "Special Permit"). The Board nevertheless imposed twenty conditions on its grant of the permit, a permit no one appealed. The conditions included this one, Condition #10: 





 Within 90 days of the commencement of operation, the applicant shall record actual noise readings (receptors shall have the same location as in the original study), to validate the project model and confirm compliance with state regulations. New information shall be submitted to the Board for professional review, at the applicant's expense, and proper mitigation measures shall be implemented, if needed. 





 The Park changed owners after issuance of the Special Permit. Its current owner, PMP, supervised construction of the Park's current 2.14-mile racetrack. That track differs in shape and location from that proposed in the Park's 2007 application. It also differs from the track that RSG modeled in 2007. 





 The Park opened for racing in May 2015. Residents thereafter began complaining about the Park's noise. Eventually the Town's building inspector and zoning-enforcement officer, plaintiff Bonita J. Weeks, brought this action in 2017 against PMP, pursuant to G.L. c. 40A, § 7. Weeks accused PMP of violating Condition #10. 





 The Court held a trial on Inspector's claims in March 2018 trial. At the conclusion of that trial, the Court told that parties that PMP hadn't complied with Condition #10. The parties asked for time to negotiate a solution. The Court gave them that time, but by late 2019 the Court concluded that the case wouldn't settle. The Court thus issued a judgment, dated January 14, 2020 (the "Judgment"). Among other things, the judgment ordered PMP, 





 by no later than 45 days from the entry of this Judgment, to (a) implement proper mitigation measures so as to remedy all of the noise conditions that the evidence at trial of this matter and/or the study of the [Park] prepared by Resource Systems Group, Inc. ["RSG"], dated November 1, 2018 [the "2018 RSG Study"] shows are not in compliance with Condition #10 and (b) following PMP's implementation of such measures, provide to the . . . Board . . . , for professional review at PMP's expense, actual noise readings from the same locations as the "original study" described in Condition #10. In order to fulfill the requirements of subparagraph (b) of this [Order], such actual noise readings and corresponding data must be in such form as to allow a professional acoustical engineer engaged by the Board to determine whether noise from the Park, after PMP's implementation of mitigation measures, meets the requirements of Condition #10. 





 Recognizing that nearly two years had passed between the March 2018 trial and the Judgment, and that conditions at the Park may have changed, the Court noted in a decision accompanying the Judgment that "[i]t's possible that PMP already has done what [the Judgment] require[s]. It's also possible that more mitigation is needed. If the [Town's zoning] enforcement officer believes that PMP hasn't complied with the Court's orders, she may seek additional orders or a finding of contempt." 





 No one appealed the Judgment. But the Court's 2020 comments were prescient. On September 22, 2020, Inspector Weeks filed a complaint for contempt (amended in October 2020), charging that PMP hadn't complied with the Judgment. PMP answered the amended complaint for contempt in March 2021. PMP claimed it had done its best to obey the Judgment, and that any non-compliance was a result of the COVID-19 pandemic.





 The parties appeared for trial by videoconference on June 22 and 23, 2021. The Court also took a view of the Park on the morning of June 22, 2021. [Note 1] After hearing the parties' witnesses, having reviewed their stipulations of fact, having considered the admitted documentary evidence, and having heard the arguments of the parties' counsel, the Court FINDS the facts set forth above, as well as these, by clear and convincing evidence: 





 1. The Special Permit authorized the use of a property located off West Ware Road in Palmer, MA (the "Property") as the site of a 2.14-mile long, 40-foot-wide motor sports course/ track, with an access road and paddock area, all within a 496-acre lot. 





 2. Since the 2015 opening of the Park, PMP has regularly conducted track-side noise monitoring, to determine if racers are exceeding the Park's published maximum noise rules. In 2017, PMP expanded the number of noise-monitoring locations, made them harder for racers to avoid, and increased the monitoring of cars in the Park's race paddock. Since the opening of the Park, PMP has "black flagged" cars found to have exceeded the maximum applicable noise level, prohibiting them from racing until their owners take measures to reduce the vehicle's sound. 





 3. In 2016, PMP started maintaining a supply of "baffle inserts" for race vehicles. One may insert the baffles directly into a racecar's tailpipe, reducing the engine's noise. Starting in 2017, PMP increased the variety of baffles the Park stocked. 





 4. In 2016, PMP installed fabric acoustic barriers near the Park's Turns 5, 9, and 10. 





 5. Following the March 2018 trial on Inspector Weeks's complaint in this action, PMP heightened its enforcement of its noise rules. A single noise violation resulted in an order to the driver to mitigate. A second violation in a day resulted in a second order to mitigate. A third violation in a day resulted in an order barring the vehicle from the track the rest of that race day. 





 6. On April 22, 2019, the Court entered this on its docket (the "April 2019 Order"): 





 The parties report that they are continuing discussions on noise mitigation plans, but have not come to an agreement. The Court discussed with the parties possible next steps in the case. Although the Court will not at this time order the parties to do anything, the parties agree that if they don't reach an agreement in the next 30 days, the Town will be responsible for issuing thereafter a notice to PMP ordering it to implement specific 'proper mitigation measures' and providing a date by which PMP must comply with the notice. After that point, it again will be up to the Town to seek enforcement of its mitigation notice. 





 7. The parties didn't reach agreement within 30 days of the April 2019 Order. As of the time of the contempt trial, the Town hadn't issued PMP a notice ordering it to implement "specific 'proper mitigation measures.'" 





 8. While it never received a mitigation notice from the Town, in 2019, after consulting with RSG, PMP installed acoustic panel noise barriers at the Park's Turn 2, Turn 5, the straightaway by Turn 5, and Turn 9. Those barriers were between 8.0 and 11.5 feet tall. 





 9. The Judgment issued on January 14, 2020. PMP reviewed the Judgment immediately after it issued. PMP believed the mitigation it had taken through January 2020 met the Judgment's requirement that PMP "implement proper mitigation measures so as to remedy all of the noise conditions that the evidence at trial . . . and/or the study of the [Park] prepared by [RSG], dated November 1, 2018 shows are not in compliance with Condition #10 . . . ." PMP thus decided in January 2020 that it wouldn't do more work at the Park besides maintaining what it had done already. 





 10. PMP also concluded in January 2020 that it could not (in the ordinary course of things) comply with the other part of the Judgment, that PMP provide to the Board within 45 days of the Judgment "for professional review at PMP's expense, actual noise readings from the same locations as the 'original study' described in Condition #10." That's because the first event noisy enough to implicate Condition #10's sound limits wasn't scheduled until the third week of April 2020. PMP's manager, Fred Ferguson, informed the Board's chairman of the timing problem. PMP also hired RSG to take noise readings at that event. PMP didn't inform the Court, however, about the Park's scheduling issues, and the PMP didn't seek to modify the Judgment. 





 11. On March 10, 2020, the Governor of the Commonwealth declared a state of emergency because of the COVID-19 pandemic. PMP thereafter cancelled the April 2020 "high sound" event. The Park resumed public events in June 2020, and scheduled its first high-sound event for July 16, 2020. PMP contacted RSG to measure sound at that event. RSG couldn't do the testing. PMP thus hired Cross-Spectrum Acoustics ("CSA") to take the measurements. 





 12. CSA measured sound at the July 16, 2020, event at four monitoring locations. Because of equipment problems, CSA didn't obtain data from two of the locations. Readings from the other two locations -- including one at the park entrance (the "Entrance," the closest monitoring location to the racetrack [Note 2]) - suggested that sound from the Park may not have exceeded Condition #10's limits. 





 13. CSA took sound measurements at the next high-sound event immediately following July 16, 2020, on August 8, 2020. This time, CSA obtained data from all four monitoring sites. The sound levels at three of the four locations were below Condition #10's limits. But the maximum Leq, 1-second sound level recorded at the Entrance, however, was 61 dBA, which exceeded Condition #10's limits by 11 dBA. 





 14. CSA prepared a report of its July and August 2020 measurements (the "2020 CSA Report"). PMP received that report on September 4, 2020, but didn't share it promptly with the Board. 





 15. The 2020 CSA Report hypothesized that the August 2020 measurements at the Entrance were worse than those taken in July 2020 in part because an August 4, 2020, windstorm had destroyed some of the acoustic panels at Turn 2, the closest turn to the Entrance. The Report also speculated that the winds on August 8, 2020, in the direction of the Entrance were stronger than those on July 16, 2020. 





 16. Inspector Weeks filed her complaint for contempt on September 20, 2020. PMP didn't send the Board the 2020 CSA Report or the raw data from CSA's testing until after September 20, 2020. (The parties didn't identify at trial the specific date on which PMP delivered to the Board the Report or the testing data.) 





 17. CSA prepared a second report on March 3, 2021, which PMP provided promptly to the Board (the "2021 CSA Report"). The Report recommended that PMP maintain in good repair the Park's acoustic barriers and increase the height of the barriers at Turn 2. PMP promptly adopted the Report's recommendations. PMP began inspecting all acoustic barriers on the day of each racing event. PMP also purchased additional acoustic panels so that Park personnel could replace damaged panels quickly. Finally, PMP increased the length of the acoustic panel noise barrier at Turn 2 by 200 feet, and increased the height of that barrier by two feet, to 13.5 feet. 





 18. The Court set Inspector Weeks's claims for trial on May 4-5, 2021. On April 29, 2021, the parties jointly moved to continue the trial. The parties agreed that, if the Court allowed the motion, PMP would 





 conduct additional sound monitoring at a 'high sound' racing event to be held [the] weekend May 1-2, 2021, at the Entrance location, to evaluate new mitigation, and a second location if selected by the Town. PMP's consultant [would] provide a report to the Town so that it may be peer reviewed. The results of the sounds monitoring and peer review will provide additional information regarding current track sound and mitigation measures, some of which has been repaired or newly installed since the last sound monitoring was conducted, and allow the parties to determine over the next 45 days whether they may resolve their dispute and whether there is a need to hold a trial in this matter. 





 19. Herbert Singleton, Jr., P.E. of CSA conducted measured sound between 9:52 AM and 11:12 AM on May 2, 2021, at the Entrance. Jason Ross, from the Board's engineering consulting firm, Vanasse Hangen Brustlin, Inc., observed the monitoring. 





 20. Three separate racing groups were using the track while monitoring was conducted on May 2, 2021. The first group included 34 cars, which were using the track simultaneously and racing between 9:58 AM and 10:18 AM. The second group included eight cars using the track simultaneously, and racing between 10:28 AM and 10:47 AM. The third group included ten cars using the track simultaneously, and racing between 10:51 AM and 11:09 AM. 





 21. The Leq, 1-second noise levels measured on May 2, 2021 at the Entrance were at or below the levels predicted by the 2007 RSG Memorandum. The maximum Leq, 1-second noise level recorded at the Entrance was 51 dBA. 





 22. Numerous background sources were audible during the May 2, 2021, measurements, including wind, birdsong, driveway traffic, West Ware Road traffic, turboprop aircraft overflights, and landscaping activity. Noise levels at the Entrance from many of these other sources were as loud, or louder, than noise from the Park. The ambient levels generated by non-Park sources ranged from 40 to 50 dBA. These sources were present during the 10:57 AM interval, when the maximum level of 51 dBA was recorded. 





 23. The 2007 RSG Memorandum nevertheless modeled the maximum instantaneous sound pressure levels from three different types of racing events: (a) driving schools and time trial clubs with 25 cars on the track, (b) race clubs with 40 cars on the track, and (c) race clubs with 24 cars on the track. The May 2, 2021 measurements do not allow the Board to determine whether, under all of the circumstances modeled in the 2007 RSG Memorandum, the Park complies with Condition #10. The May 2, 2021 measurements also were taken on one day, over only one hour, and under one set of weather conditions. 





*.*.* 





 A finding of civil contempt requires "a clear and undoubted disobedience of a clear and unequivocal command." In re Birchall, 454 Mass. 837 , 852 (2009) (citations omitted). By agreement of the parties, the Court heard five issues at trial [Note 3]: 





 1. Whether PMP, within 45 days from the entry of the Judgment, complied with ordering paragraph D(a) of the Judgment (the "Mitigation Requirement")? 





 2. If the answer to issue #1 is yes, whether, within 45 days from the entry of the Judgment, PMP complied with ordering paragraph D(b) of the Judgment (the "Testing Requirement")? 





 3. Whether, if PMP did not comply with either or both Requirements, (i) the Town failed to comply with the April 2019 order; and, if so, (ii) that failure excused PMP's non-compliance? 





 4. Whether, if PMP did not comply with either or both Requirements, the doctrine of unclean hands prevents the Town from enforcing the Judgment? 





 5. If PMP has not complied with the Requirements, what remedies are appropriate? The Court addresses each issue in turn. 





 PMP's compliance with the Mitigation Requirement. The Court HOLDS that PMP complied with the Mitigation Requirement. The evidence shows that the mitigation PMP undertook through February 28, 2020 (45 days after the Judgment), if continuously maintained (in the case of physical barriers) and continuously enforced (in the case of track-side monitoring and black flagging), may keep the Park within Condition #10's noise limits. 





 PMP's compliance with the Testing Requirement. The Court HOLDS that PMP did not comply with the Testing Requirement. Mr. Ferguson testified that he understood immediately upon getting the Judgment that PMP would do no further mitigation. Hence, as of the date of the Judgment, all that remained for PMP was meeting the Testing Requirement. PMP didn't meet the Testing Requirement, however, until sometime after September 20, 2020, the date Inspector Weeks filed her complaint for contempt. 





 PMP correctly points out that a court may not hold someone in contempt if that person doesn't have the ability to comply with the court's order. See Cooper v. Keto, 83 Mass. App. Ct. 798 , 804 (2013). The evidence shows, however, that PMP was unable to comply with the Testing Requirement only between January 14, 2020 (the date of the Judgment) and July 16, 2020. Even if the 45-day clock started on July 16, 2020 (a generous reading of the Judgment), PMP was obligated either to provide to the Town testing data by August 31, 2020, or seek modification of the Judgment. See New England Overall Co. v. Woltmann, 343 Mass. 69 , 80 (1961) (court's order must be followed "unless and until the decree is vacated in the trial court or is reversed in appellate proceedings"). PMP did neither. Instead, it withheld its partial data from the July 16, 2020, event. It also didn't turn over data from the August 8, 2020, event (a report concerning which PMP had as early as September 4, 2020) until Inspector Weeks filed her contempt complaint. PMP hence brought on itself a finding of contempt. 





 PMP's violation of the Testing Requirement is not trivial or insubstantial. Condition #10 imposes an iterative process: it requires measurement by PMP of sounds from the Park, followed the Board's review of those measurements, followed by mitigation to be performed by PMP if the measurements don't show that actual noise levels are under those predicted in the 2007 RSG Memorandum. Unless PMP chooses to "mitigate" by closing the Park entirely to racing by loud vehicles, the only way to determine whether mitigation works is by taking further sound measurements. The Judgment's Requirements mirrored Condition #10's process. By not timely providing post-mitigation sound measurements to the Board, PMP delayed the Board from determining whether PMP's mitigation worked. Moreover, the data PMP has provided to the Board since September 2020 suggests that while PMP has made progress towards complying with the 2007 RSG Memorandum's sound limits, testing under conditions other than those experienced on August 8, 2020, and May 2, 2021, is needed. [Note 4] 





 Whether the Town's alleged failure to comply with the April 2019 Order excuses PMP's non-compliance. PMP contends that April 2019 Order required the Town to send PMP notice of the mitigation efforts the Town wanted PMP to take. The Court disagrees. In any event, PMP's violation of the Testing Requirement has nothing to do with whatever mitigation the Town might have ordered in 2019: PMP's violation stems from its untimely delivery of testing data. The Court thus HOLDS the Town's refusal to identify mitigation does not excuse PMP's violation of the Testing Requirement. 





 Whether the Town has unclean hands. The doctrine of unclean hands allows a court to deny equitable relief to those who themselves have acted inequitably, or in bad faith. See Spinosa v. Tufts, 98 Mass. App. Ct. 1 , 7-8 (2020); Fidelity Mgmt. Research Co. v. Ostrander, 40 Mass. App. Ct. 195 , 200 (1996). PMP introduced no evidence that anyone at Town acted inequitably or in bad faith in seeking to enforce the Judgment. PMP also has provided no proof that anyone at the Town caused or encouraged PMP to provide testing data late. The Court thus HOLDS that the doctrine of unclean hands thus does not deprive Inspector Weeks of the right to enforce the Judgment. 





 Remedies. Inspector Weeks requests two remedies. The first is an award of her attorney's fees in prosecuting her contempt complaint. The Court GRANTS that relief. See Martinez v. Lynn Housing Authority, 94 Mass. App. Ct. 702 , 708 (2019) (successful contempt complaint plaintiff is entitled to an award of attorney's fees). The Court ORDERS Inspector Weeks to file a suitably supported application for fees by September 3, 2021. The Court will grant fees only through the conclusion of the contempt trial. 





 Inspector Weeks also asks for an order directing PMP to take and furnish to the Board additional sound measurements. The Court GRANTS that request. The Court ORDERS Inspector Weeks to file by September 3, 2021, a proposed order directing specific additional monitoring, all aimed at determining PMP's compliance with Condition #10. 





SO ORDERED.





FOOTNOTES
[Note 1] The view included the undersigned justice driving the racecourse in his 2016 Subaru Crosstrek, at considerably less speed than the track's intended users. 

[Note 2] At the time the Special Permit issued, the Entrance was the site of the closest residence to the Park. In 2012, PMP bought the residence and demolished it. The Entrance nevertheless remains a monitoring location under Condition #10. 

[Note 3] In its amended pretrial brief, PMP dropped two defenses to the Inspector's contempt complaint, waiver and estoppel. 

[Note 4] The Court rejects PMP's contention that a study mentioned in the Judgment, the 2018 RSG Study, established different acoustic requirements under Condition #10. While the Court appreciates that the Park's design changed after issuance of the Special Permit, and may have upset the assumptions upon which Condition #10 was based, the Board never amended Condition #10 to base it on any model other than the one in the 2007 RSG Memorandum. (Putting the point another way, the Court rejects the premise of Trial Exhibits 7 and 9 that there are "as-built modeled sound values" to which Condition #10 is now tied.) The Judgment refers to the 2018 RSG Study only because it contains evidence that, prior to November 2018, the Park's sound exceeded the levels predicted in the 2007 RSG Memorandum. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.